# STATE of Wisconsin, Plaintiff-Respondent,

## v.

# Clarence James TEYNOR, Defendant-Appellant.†

Court of Appeals

*Nos. 86–1077–CR, 87–1589–CR. Submitted on briefs February 9, 1987.—Decided August 27, 1987.*
(Also reported in 414 N.W.2d 76.)

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

189

190

191

192

193

For the defendant-appellant the cause was submitted on the briefs of *Mark A. Eisenberg* and *Eisenberg Law Offices, S.C.,* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Jerome S. Schmidt,* assistant attorney general.

Before Dykman, Eich and Sundby, JJ.

SUNDBY, J. Clarence Teynor appeals from a judgment convicting him of burglary, contrary to sec. 943.10(1)(a), Stats., and four counts of false imprisonment contrary to sec. 940.30, Stats., and an order denying his postconviction motion for relief.[1] The burglary and false imprisonment convictions arise out of an incident which occurred July 23, 1985 in which Teynor is alleged to have entered his estranged wife's apartment without her consent and forced her and three of their children to accompany him to the former family home.

Teynor contends: (1) Because of his status as their parent, he could not be convicted of unlawfully imprisoning his children. (2) The temporary custody order did not deprive him of his lawful authority to confine and restrain his children. (3) There is no evidence from which the jury could have found him guilty beyond a reasonable doubt of false imprisonment of his wife and his children. (4) The trial court abused its discretion when it allowed the state to impeach him with a prior inconsistent statement without giving him an opportunity to explain the statement. (5) He was denied the effective assistance of counsel. (6) The trial court violated his right to be free from cruel and unusual punishment when it sentenced him to four consecutive one-year terms on the false imprisonment convictions. We reject Teynor's contentions and affirm.

---

[1]Teynor does not challenge his conviction of bail jumping contrary to sec. 946.49(1)(a), Stats., for violation of a condition of a recognizance bond that he have no contact with his wife.

# I.
# BACKGROUND OF THE CASE

In January 1985 divorce proceedings the court awarded Teynor's wife, Janice, temporary custody of the couple's four children, pending an evidentiary hearing. The hearing was never held. Teynor exercised visitation. In June 1985 their son, James, began to live with Teynor.

In January 1985 Janice obtained a "domestic abuse injunction" under sec. 813.12, Stats., prohibiting Teynor from contacting Janice directly or going to her residence. In May 1985 Teynor gave a recognizance bond to secure his appearance on a disorderly conduct charge, conditioned that he have no direct or indirect contact with Janice.

On July 23, 1985 Teynor went to Janice's apartment. Their testimony conflicts as to whether he knocked prior to entering. In fact, their testimony is in serious conflict as to the events of that day. What is undisputed is that Janice packed and she and their three daughters were transported by Teynor from Holmen to the family's farm home in Wauzeka. Upon receiving a phone call telling him that the police were on their way to the farm, Teynor drove Janice and the children into some nearby woods. That evening Teynor surrendered Janice and the children to a priest and local authorities. Other facts will be set forth as necessary to our discussion of the issues.

# II.
# FALSE IMPRISONMENT

Section 940.30, Stats., provides: "Whoever intentionally confines or restrains another without the person's consent and with knowledge that he or she

has no lawful authority to do so is guilty of a Class E felony."

Teynor argues that because of his status as their parent, he could not be convicted of the offense of false imprisonment of his children.[2] His appeal presents a question of first impression in Wisconsin. We conclude that a parent may commit the offense of false imprisonment against the parent's child.

Teynor cites *State v. Lawrence,* 663 P.2d 561 (Ariz. 1983), where it was held that a mother who confined her four-year-old daughter in a foot locker for an extended period could not be guilty of criminal unlawful imprisonment. The Arizona statute provides: "A person commits unlawful imprisonment by knowingly restraining another person." Ariz. Rev. Stat. Ann. sec. 13–1303(A) (1978). The statutory definition of "restrain" requires that the restraint must be done without consent and without legal authority. Ariz. Rev. Stat. Ann. sec. 13–1301(2) (1978). The court held that the legislative intent in using the phrase "without legal authority" was to render the statute inapplicable because of the defendant's status with respect to the victim. The court adopted the following statement from the concurring opinion in the court of appeals:

> [T]he phrase [without legal authority] seems clearly to suggest that where a legal status exists which ordinarily will entail control or discipline, such as that of parent and child, the crime of unlawful imprisonment is inapplicable.

---

[2]Teynor does not contend that he could not be found guilty of the offense of falsely imprisoning Janice.

*Lawrence,* 663 P.2d at 563. *See also State v. Benner,* 385 A.2d 48, 49 (Me. 1978) (the legislative history showed that the legislature had established as the public policy of the state that a parent could not commit the crimes of kidnapping or unlawful confinement or transportation of his or her minor child).

The legislative history of sec. 940.30, Stats., establishes that the legislature did not intend that the lawful authority which a parent has to confine or restrain his or her child makes the parent immune from prosecution under the statute for the nonconsensual restraint or confinement of the child.[3] Section 940.30 was created by ch. 696, Laws of 1955, which created a new criminal code. The discussions of the criminal code advisory committee of the Wisconsin legislative council show that the committee suggested that the legislature address the issue of parental liability for certain crimes against their children under the defense of domestic authority. 5 *Wisconsin Legislative Council and Council Committees 1953–55,* Minutes of the Criminal Code Advisory Committee, April 29, 30 and May 1, 1954, p. 13 (Legislative Reference Bureau). In consequence, sec. 939.45, Stats., was created to read:

> The fact that the actor's conduct is privileged, although otherwise criminal, is a defense to prosecution for any crime based on that conduct. The

---

[3]Teynor asks us to consider the legislative history of the federal kidnapping statute, 18 U.S.C. 1201 (1982), and the Parental Kidnapping Prevention Act of 1980, Pub. L. No. 96–611, 94 Stat. 3566 (codified in scattered sections of 42 U.S.C. and 28 U.S.C. 1738(A)). We find this unnecessary because of the more pertinent legislative history of Wisconsin's criminal code.

defense of privilege can be claimed under any of the following circumstances:

....

(5) When the actor's conduct is reasonable discipline of a minor by his parent ....

■

The parental status affords only a privilege which may be asserted as a defense to prosecution for any crime by a parent against his or her child if the conduct is reasonable discipline of the child. We therefore reject Teynor's contention that because of his status as their parent he could not be guilty of the offense of falsely imprisoning his children.[4]

## III.
## EFFECT OF TEMPORARY CUSTODY ORDER

■

The lawful authority of a parent over a minor child includes the authority to direct the child's activities and where the child shall live. That authority may be exercised by confining or restraining the child in a reasonable way. *People v. Walker,* 473

---

[4]Teynor argues that the legislature has enacted statutes—secs. 946.71 and 946.715, Stats.—to deal with "analagous" situations. Section 946.71 proscribes interference with the custody of a child and sec. 946.715 proscribes interference by a parent with the parental rights of the other parent. Teynor does not argue, however, that these statutes were intended by the legislature to be the extent of the legislature's treatment of crimes by a parent against his or her child. As Teynor points out, he could not have been convicted of violating either of these statutes because an essential element—withholding the child from the custodial parent—was missing. These statutes and sec. 940.30, Stats., simply proscribe different conduct.

N.E.2d 995, 997 (Ill. App. Ct. 1985). In the absence of a legally effective court order awarding custody of a child to another, a parent does not commit the crime of kidnapping or a similar crime by taking exclusive possession of the child. *Adams v. State,* 126 S.E.2d 624, 625 (Ga. 1962). *See also* Annotation, *Kidnapping or Related Offense By Taking or Removing Child By or Under Authority of Parent or One In Loco Parentis,* 20 A.L.R.4th 823, 828–29 (1983). Teynor contends that the temporary custody order was not legally sufficient to deprive him of his authority to confine or restrain his children.

Teynor relies on *Adams v. State, supra,* and *People v. Fields,* 300 N.W.2d 548 (Mich. Ct. App. 1980). In *Adams,* 126 S.E.2d at 626, the court decided that based on the nature of an award of temporary custody a father who seized and took his child away from the mother who had been awarded temporary custody could not be convicted of kidnapping under the Georgia statute. In *Fields,* 300 N.W.2d at 550, the court held that parents who seized and carried away their children who had been made temporary wards of the court were not guilty of the crime of kidnapping. The court concluded that the temporary loss of physical possession of a child could not serve as the basis for conviction of kidnapping under the Michigan statute. *Id.*

We agree with the court in *State v. Chapman,* 702 P.2d 879, 881 (Idaho Ct. App. 1985), that *Adams* and *Fields* are "unpersuasive." We see no difference in determining the lawful authority of a parent to direct the activities of his or her child between a temporary custody order and a judgment making a permanent award of custody.

The temporary custody order was entered under sec. 767.23(1)(a), Stats.[5] Section 767.24(1)(d) provides: "The award of legal custody of a child under this section or s. 767.23(1)(a) shall give to the custodian the rights and responsibilities specified in s. 48.02(12) ...."

Section 48.02(12), Stats., provides:

> "Legal custody" means a legal status created by the order of a court, which confers the right and duty to protect, train and discipline the child, and to provide food, shelter, legal services, education and ordinary medical and dental care, subject to the rights, duties and responsibilities of the guardian of the child and subject to any existing parental rights and responsibilities and the provisions of any court order.

■ We conclude that upon entry of the temporary custody order Teynor lost the lawful authority which he possessed as a parent having custody of his child to determine where his children would live and to direct the activities of his children except when exercising lawful visitation.

■ Teynor argues that the temporary custody order should not be given legal effect because the family court commissioner did not consider the factors as required under secs. 767.23(1n) and 767.24(2), Stats.,

---

[5]Section 767.23, Stats., provides:

(1) Except as provided in ch. 822, in every action affecting the family, the court or family court commissioner may, during the pendency thereof, make just and reasonable temporary orders...:

(a) Granting legal custody of the minor children to the parties jointly, to one party or to a relative or agency specified under s. 767.24(1)(c).

which were to be considered at a later evidentiary hearing. Although the temporary order was intended to be effective for a limited period of time, it was nonetheless a custody order which determined which parent would have custody of the children during that period of time. The fact that the order was subject to revision after a subsequent evidentiary hearing does not diminish its legal effect.

Teynor next argues that the temporary order was ambiguous, presumably as to custody issues intended to be resolved at the evidentiary hearing. The order was not ambiguous as to the intent of the family court commissioner that Janice was to have custody until the evidentiary hearing.

Finally, Teynor claims that the custody order should not be construed to deprive him of his lawful authority over his children because the order was ignored. The fact that he and Janice modified custody and visitation in some respects did not vitiate the order. We conclude that on July 23, 1985, the date of the alleged offense, the temporary order gave Janice custody of the parties' children and deprived Teynor of the lawful authority to direct their activities and determine where they were to live.

## IV.
## SUFFICIENCY OF THE EVIDENCE

The elements of the offense of false imprisonment are (1) confinement or restraint of a named person, (2) intentionally, (3) without the person's consent, (4) knowing the confinement or restraint is without the person's consent, (5) without lawful authority, and (6) with knowledge of the lack of authority. Wis J I—

Criminal 1275. Teynor does not dispute that the first two elements were satisfied but he argues that there is no evidence from which the jury could have found beyond a reasonable doubt that the remaining elements were present.

■

The test of whether the evidence is sufficient to support the jury's guilty verdict is not whether the appellate court is convinced beyond a reasonable doubt of the defendant's guilt but whether the court can conclude that the trier of fact could, acting reasonably, be convinced to the required degree of certainty by evidence that it had a right to believe and accept as true. *State v. Whiting,* 136 Wis. 2d 400, 409, 402 N.W.2d 723, 727 (Ct. App. 1987).

(a) *Lack of Consent.* Teynor claims there is no evidence in the record which shows that the confinement and restraint of Janice and the children were without their consent and that he knew he did not have their consent. Section 939.22, Stats., provides:

> In chs. 939 to 948, the following words and phrases have the designated meanings unless the context of a specific section manifestly requires a different construction:
>
> (48) "Without consent" means no consent in fact or that consent is given for one of the following reasons:
>
> (a) Because the actor put the victim in fear by the use or threat of imminent use of physical violence on him, or on a person in his presence, or on a member of his immediate family; or
>
> . . . .
>
> (c) Because the victim does not understand the nature of the thing to which he consents ... by reason of youth ....

Jennifer, who was three years old at the time of the alleged offense, was incapable of giving her consent. Section 939.22(48)(c), Stats. Melissa and Trudie testified that they did not want to go with their father when he took them out of the apartment and that they were afraid.

Janice testified as follows: On July 23, 1985, Teynor, without knocking, walked into her apartment carrying Jennifer and said he had come to take his family home. When she told him that she did not want to go with him, he pushed her up against the stove and put his fist to her face and said, "You're coming with me." When she tried to use the phone he took it off the hook and punched a hole in the wall with his fist. She was frightened. He then took her by the arm and led her into the bedroom and told her to pack her things. He told her and the children to get into the truck. The children were scared and crying. At the farmhouse, he got a telephone call telling him that the police were on their way. He then took Janice and the children back to the truck and drove into some woods on the farm. Later when Teynor went to the house to get blankets, Janice did not try to escape because she did not wish to leave the children and she was afraid that Teynor would catch her and beat her. When the police arrived, Teynor told Janice to come with him up into the woods and when she refused, he took her glasses off and pulled his fist back as if to hit her. When she continued to refuse to go with him, Teynor tried to pull her out of the car. Teynor's testimony contradicted Janice's. It is the trier of fact's duty to determine the credibility of witnesses. *State v. Daniels,* 117 Wis. 2d 9, 17, 343 N.W.2d 411, 415 (Ct. App. 1983).

The evidence supports the jury's finding that Janice and the children did not consent to accompany Teynor to the farm. We conclude that the jury, acting reasonably, could have been convinced beyond a reasonable doubt by the evidence that Teynor unlawfully imprisoned Janice and his children without their consent and with knowledge that they did not consent to their restraint and confinement.

(b) *Lack of Lawful Authority.* Teynor does not claim that he had lawful authority to confine Janice. The jury was instructed that it could find Teynor guilty of false imprisonment of his children if it was satisfied beyond a reasonable doubt that Teynor acted excessively or unreasonably in the manner in which he confined and restrained them. The jury was further instructed that it could consider the custody order and the domestic abuse injunction in determining whether Teynor acted reasonably.[6] The evidence the jury had a

---

[6]The jury was instructed as follows:

> It is for you, the jury, to determine whether the confinement and restraint by the defendant was reasonable and not excessive. In determining whether the confinement and restraint was or was not excessive, you should consider the age, sex, physical and mental condition and disposition of the child, or children, the nature of the confinement and the surrounding circumstances. You should also consider the presence or absence of any orders limiting the defendant's authority over his children. If you find beyond a reasonable doubt that the defendant exceeded his authority or that his conduct was unreasonable under all of the circumstances then you may find that the defendant lacked lawful authority to confine or restrain Melissa, Trudie and/or Jennifer Teynor. If, however, you are not so satisfied, you must find that the defendant had lawful authority to confine or restrain Melissa, Trudie or Jennifer Teynor.

right to believe and accept as true establishes that Teynor acted excessively and unreasonably in confining and restraining his children.

(c) *Knowledge of Lack of Authority.* Teynor does not claim he did not know that he had no lawful authority to restrain or confine Janice. He argues that he could not have known that he had no lawful authority to restrain or confine his children since the trial court was not even certain as to whether the temporary custody order deprived him of lawful authority. Failure to know that one's conduct is criminally punishable is not a defense. *State v. Britzke,* 108 Wis. 2d 675, 683, 324 N.W.2d 289, 292 (Ct. App. 1982), *aff'd,* 110 Wis. 2d 728, 329 N.W.2d 207 (1983).

Teynor admitted that when he went to Janice's apartment he was violating a condition of his recognizance bond. He knew Janice had been awarded temporary custody of the children. The jury could infer from his admissions and his conduct that Teynor knew he was without lawful authority to confine or restrain his children.

## V.
## BURGLARY

Section 943.10(1)(a), Stats., provides that whoever intentionally enters any dwelling "without the consent of the person in lawful possession and with intent to steal or commit a felony in such place is guilty of a Class C felony." Teynor contends he cannot be convicted of burglary because he had no intent to commit a felony prior to entering the premises.

Teynor testified:

[I] told my wife that I know I wasn't supposed to be there. I know I was jumping a $300 bail bond. ... I'd go to any extremes to put my family back together....

The evidence was overwhelming that Teynor by intimidation and threat of force intentionally confined and restrained his wife and children without their consent. As he testified, he was willing to go to any extreme to put his family back together again. The jury could reasonably conclude that when Teynor went to his wife's apartment and entered, he, at that moment, had the intent to confine and restrain his wife and family without their consent, knowing that he had no authority to do so. We conclude his conviction of burglary is supported by the evidence.

## VI.
## IMPEACHMENT WITH PRIOR INCONSISTENT STATEMENT

On cross-examination the prosecutor asked Teynor whether he had ever referred to his wife as a "bitch." Teynor responded: "Never to her." The prosecutor then questioned Teynor about a calendar which contained an entry in Teynor's handwriting stating: "Bitch called and said I can keep kids for another week." The state also introduced a letter which Teynor had written to Janice but never mailed. The letter stated: "Merry Christmas you bitch ...." Teynor objected to the introduction of these statements but they were admitted as prior inconsistent statements.

We agree that it was an abuse of discretion to admit these statements as prior inconsistent state-

ments. However, their admission was harmless. This evidence was of extremely low probative value on the determinative issue, i.e., whether Teynor confined and restrained Janice without her consent and with the knowledge that he lacked lawful authority to confine or restrain her. In view of the overwhelming evidence that Teynor falsely imprisoned Janice, there is no "reasonable possibility that the error contributed to the conviction." *State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222, 232 (1985).

## VII.
## EFFECTIVE ASSISTANCE OF COUNSEL

Teynor contends that he was denied the effective assistance of counsel contrary to the sixth amendment to the United States Constitution and art. I, sec. 7 of the Wisconsin Constitution.[7] A defendant's claim that he has been denied the effective assistance of counsel contrary to the sixth amendment is to be reviewed in accordance with the principles set down in *Strickland v. Washington,* 466 U.S. 668 (1984). *Burger v. Kemp,* 483 U.S. —, —, 97 L. Ed. 2d 638, 654 (1987).

The *Strickland* test is a two-part test: deficient performance and prejudice to the defendant. *State v. Marty,* 137 Wis. 2d 352, 356, 404 N.W.2d 120, 122 (Ct.

---

[7]Teynor acknowledges that a claim based on the Wisconsin Constitution would require briefing. *See State v. Pitsch.* 124 Wis. 2d 628, 646–48, 369 N.W.2d 711, 721 (1985). Teynor has not briefed whether a more deferential review is required under an analysis governed by art. I, sec. 7 of the Wisconsin Constitution. *See State v. Marty,* 137 Wis. 2d 352, 362, 404 N.W.2d 120, 124 (Ct. App. 1987). He therefore has abandoned his claim under the Wisconsin Constitution. *Reiman Associates v. R/A Advertising,* 102 Wis. 2d 305, 306 n. 1, 306 N.W.2d 292, 294 (Ct. App. 1981).

App. 1987). "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland*, 446 U.S. at 698. Thus, we will not reverse the trial court's findings of fact, that is, the underlying findings of what happened, unless they are clearly erroneous. Sec. 805.17(2), Stats. The questions of whether counsel's performance was deficient and whether a deficiency in performance was prejudicial to Teynor are however questions of law, and we do not defer to the decision of the trial court. *State v. Pitsch*, 124 Wis. 2d 628, 634, 369 N.W.2d 711, 715 (1985). "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

We consider the specific deficiencies Teynor finds in trial counsel's performance: (a) counsel did not properly investigate the case, (b) he failed to impeach Janice's credibility, (c) he failed to object to the admission of "other crimes" evidence, (d) he failed to object to prejudicial hearsay, (e) he failed to call witnesses Teynor requested, (f) he failed to attack Janice's credibility by introducing evidence of her extramarital affairs, and (g) he failed to object to the language added to the pattern jury instruction which allowed the jury to consider the presence or absence of any orders limiting Teynor's authority over his children.

(a) *Inadequacy of Preparation.*

1. *Research.* Teynor contends that his counsel did not adequately research the question of whether a parent could be convicted of falsely imprisoning his own child. We need not consider whether counsel's

performance in this respect was deficient because we conclude Teynor was not prejudiced by that lack of research. Teynor was substantially better off under the instructions given than he would have been had the jury been instructed as to the legal effect of the temporary custody order. We conclude Teynor has failed to show that counsel's research performance, if it was deficient, prejudiced his defense.

2. *Failure to Interview Children.* Teynor contends that counsel should have interviewed the children. However, he did not show how that failure prejudiced his defense. Teynor had the burden of showing that counsel's representation in this respect fell below an objective standard of reasonableness. We cannot review counsel's performance in the absence of evidence.

3. *Psychiatric Evaluation of Teynor.* Teynor contends that in view of counsel's knowledge as to his personality, he should have consulted a psychiatrist, presumably for the purpose of examining Teynor. Counsel stated that he tried to keep psychiatrists and psychologists as far away from Teynor as possible. Teynor has failed to explain how counsel's performance in this respect fell below an objective standard of reasonableness. Further, he has failed to show how he was prejudiced by failure of counsel to have such evaluation done. We cannot review Teynor's argument.

(b) *Failure to Impeach Janice's Credibility.*

██

1. *Deceptive, Manipulative Person.* Teynor contends that two persons would have testified that Janice was a deceptive and manipulative person. Counsel's theory of defense was that this case present-

ed only an ordinary domestic matter and that Teynor acted solely out of love for his family and "to save the family from the ruin of divorce, to save his children from that horrible welfare environment, [and] to put his marriage back together, if possible." The trial court pointed out that counsel was largely successful in painting to the jury a picture of Teynor as "a nice, peaceful man living happily with his family down in Crawford County." It was not consistent with that picture of domestic tranquility to paint Janice as a manipulative, deceptive person. That counsel's trial strategy was unsuccessful does not mean his performance was legally insufficient.

2. *Janice's Fear of Teynor.* Teynor claims that his sister could have testified that Janice had told her that Teynor had never hit her and that she was never afraid of him. There is no evidence that counsel was aware of this possible testimony at the time of trial. Nor does Teynor suggest that counsel's performance was deficient in failing to interview his sister. We conclude Teynor has failed to show that counsel's performance in this respect fell below an objective standard of reasonableness.

3. *The Hole in the Wall.* Teynor claims counsel should have called his son who would have testified that he put the hole in the wall or most of the hole in the wall. Counsel testified that he did not call James because he would have been a very reluctant witness who did not wish to take sides between his mother and father. He testified that his experience had been that calling an upset minor as a witness "can be particularly disastrous." He further testified that he feared that Teynor's son would corroborate Janice's version of what happened in the woods on the day of the alleged offense. The record establishes that, in this respect,

counsel exercised judgment fully meeting an objective standard of reasonableness.

(c) *Failure to Object to "Other Crimes" Evidence.* Teynor claims that counsel's performance was deficient in failing to object to the admission of other crimes or wrongs committed by Teynor. Such evidence is admissible under sec. 904.04(2), Stats., if admitted for one of the enumerated purposes, and if its probative value is not substantially outweighed by the danger of unfair prejudice. *State v. Pharr,* 115 Wis. 2d 334, 343–44, 340 N.W.2d 498, 502 (1983). Teynor contends that the following "other crimes" evidence was erroneously admitted without objection from counsel.

1. *Signature Bond.* The signature bond Teynor signed on a disorderly conduct charge was admissible because Teynor's failure to comply with the bond was the basis for the bail jumping charge for which he was being tried.

2. *Contempt Motion.* Motion papers in the divorce action to find Teynor in contempt for failing to file documents as required by a pretrial order were erroneously admitted under sec. 904.04(2), Stats. This evidence was not offered as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Counsel's failure to object was deficient performance. However, we conclude Teynor was not prejudiced by the introduction of this evidence. The evidence was not of a nature to hold Teynor up to contempt or ridicule, or likely to sway the jury in deciding whether he had committed the alleged offense. We conclude that the prejudice to

Teynor was minimal and in the totality of the evidence, did not affect the outcome of his trial.

3. *Sheriff's Testimony.* The sheriff of Crawford county testified as follows:

Q: Why did you call off the search that evening?

A: Well[,] it was no point in trying to find—we knew we had—knew his wife and children were safe. But we was trying to look for that car, the vehicle he used. But I told the boys, I said, "There's no point in looking for him around here tonight and trying to find him and get somebody hurt."

The sheriff's testimony was not "other crimes" evidence. It does not accuse Teynor of committing other crimes or wrongs. His statement may have been excluded on other grounds but it does not constitute evidence that Teynor had committed an earlier crime or wrong. We therefore conclude that failure to object to admission of this evidence was not deficient performance.

(d) *Failure to Object to Prejudicial Hearsay.* Janice and the children, including James, were taken to the victim-witness coordinator's home on the morning Teynor released them. At approximately 7 p.m. that evening, the coordinator interviewed each child and asked "What is your greatest concern right now?" She testified, without objection from Teynor's counsel, that each child had responded "I'm afraid that my father is going to kill my mother," or words to that effect. Janice was allowed to testify that the children told her during the incident they wished they were home and that they did not want to be on the farm with Teynor. Teynor contends that these statements

were hearsay and were prejudicial to his defense. We conclude that these statements were admissible under sec. 908.03(2), Stats., as excited utterances and under sec. 908.03(3) as statements of the declarant's then-existing state of mind or emotion.

Under sec. 908.03(2), Stats., time is measured by the duration of the condition of excitement rather than mere time lapse from the event or a condition described. *State v. Padilla,* 110 Wis. 2d 414, 418, 329 N.W.2d 263, 266 (Ct. App. 1982). "A broad and liberal interpretation is given to what constitutes an excited utterance when applied to young children." *Id.* at 419, 329 N.W.2d at 266. Young children produce declarations "free of conscious fabrication" for a longer period after the incident than do adults. *Id.* It is unlikely that a young child will review an incident and calculate the effect of his or her statement. *Id.; see United States v. Nick,* 604 F.2d 1199, 1204 (9th Cir. 1979). In *Padilla,* the court found the girl's description of a sexual assault made three days after the assault to be admissible as an excited utterance. The court emphasized that spontaneity and stress are the keys. *Id.* at 421, 329 N.W.2d at 267.

Here, the statements to Janice were contemporaneous with the incident. The statements to the witness-victim coordinator followed an extended period of stress for the children. The events of the previous evening were undoubtedly still foremost in their minds. In the circumstances, we conclude that the statements of the children made to the victim-witness coordinator and to Janice were admissible under sec. 908.03(2), Stats.

We conclude the statements were also admissible under sec. 908.03(3), Stats. They expressed the state of mind—desire not to be at the farm and fear for their mother's safety—which each of the children had at the time the statements were made.

Teynor contends that the admission of the statements of the children violated his sixth amendment right to confront the witnesses against him. Compliance with a state's hearsay rule does not insure compliance with the constitutional mandate for confrontation in a criminal case. *Muller v. State*, 94 Wis 2d 450, 463–64, 289 N.W.2d 570, 577 (1980).

There are two requisites to satisfaction of the confrontation right when a statement of a witness not present at trial is admitted into evidence. First, the witness must be unavailable. Second, the evidence must bear some indicia of reliability. *State v. Bauer*, 109 Wis. 2d 204, 215, 325 N.W.2d 857, 863 (1982).

Since Melissa and Trudie both testified and were available to be cross-examined by Teynor, his confrontation right was not violated by admitting their statements. It is well established that the confrontation clause is satisfied by the opportunity for effective cross-examination. "The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.* [Emphasis in original]" *State v. Lenarchick*, 74 Wis. 2d 425, 441, 247 N.W.2d 80, 89 (1976) quoting 5 Wigmore, *Evidence,* sec. 1395, p. 150 (Chadbourn rev. 1974).

However, James did not testify and the state made no effort to establish that he was unavailable. We conclude that James' statement that he feared his

father might kill his mother would have been excluded had counsel timely objected. However, we conclude that Teynor's defense was not prejudiced since James' statement was merely cumulative of the statements made by his sisters.

(e) *Failure to Call Witnesses Teynor Requested.* Teynor claims he requested that counsel call his son and Randy Wold as witnesses. Counsel denied that Teynor asked him to call either of these persons as witnesses. The credibility of the witnesses is for the trier of fact. *Wheeler v. State,* 87 Wis. 2d 626, 634, 275 N.W.2d 651, 655 (1979). The trial court made the following finding with respect to the credibility of Teynor: "I specifically find that his testimony is unbelievable, particularly as to the witnesses he insisted as being called." Therefore Teynor has failed to establish any omission in this respect which may be the basis for an ineffective assistance claim.

(f) *Failure to Introduce Evidence of Janice's Extramarital Affairs.* Teynor contends that counsel should have attacked Janice's credibility by delving into an alleged extramarital affair. Counsel testified that he made the strategic decision not to attempt to introduce evidence as to Janice's alleged extramarital affair because he did not wish to provide the jury with a motive for Teynor's behavior other than his desire to put back together the family which he loved. The trial court noted that introduction of this evidence would have been contrary to counsel's whole defense theory of Teynor as being a nice, peaceful man living happily with his family. We conclude that Teynor failed to

217

show that counsel's representation in this respect fell below an objective standard of reasonableness.

■

(g) *Failure to Object to Language Added to the Pattern Jury Instruction.* The fifth element of the offense of false imprisonment is that the defendant was without lawful authority to confine the individual or individuals alleged to have been unlawfully confined or restrained. Wis J I—Criminal 1275. The trial court elaborated on this instruction, explaining that the jury could consider the temporary custody order in determining whether Teynor acted without authority. *See* note 6, *supra.*

Teynor argues that the existence of the temporary custody order was irrelevant to his lawful authority to confine or restrain his children, and therefore the instruction was prejudicial and counsel was deficient in his performance in failing to object to the instruction. Because we have concluded that a temporary custody order is relevant to a parent's authority to confine or restrain his or her child, counsel's performance in failing to object to the instruction was not deficient. The instruction correctly stated the law. Therefore, Teynor has failed to show that in this respect counsel's representation fell below an objective standard of reasonableness.

## VIII.
### SENTENCE: ABUSE OF DISCRETION

Teynor contends the sentences imposed on him are disproportionate to the gravity of the offenses and therefore constitute cruel and unusual punishment under the eighth amendment to the United States Constitution and art. I, sec. 6 of the Wisconsin

Constitution. He urges that we follow the criteria approved by the American Bar Association to impose probation instead of prison sentences. *See* 3 *American Bar Association Standards for Criminal Justice,* Sentencing Alternatives and Procedures, ch. 18 (2d ed. 1980). The adoption of such standards is the prerogative of the Wisconsin Supreme Court.

"Sentencing is left to the discretion of the trial court, and appellate review is limited to determining whether there was an abuse of discretion." *State v. Harris,* 119 Wis. 2d 612, 622, 350 N.W.2d 633, 638 (1984). There is a strong public policy against interference with the sentencing discretion of the trial court and sentences are afforded the presumption that the trial court acted reasonably. *Id.* The test for determining whether a sentence constitutes cruel and unusual punishment is whether the sentence is "so excessive and unusual, and so disproportionate to the offense committed, as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *Steeno v. State,* 85 Wis. 2d 663, 669, 271 N.W.2d 396, 399 (1978).

In *Harris,* 119 Wis. 2d at 623–24, 350 N.W.2d at 639, the court summarized the standards or factors which a trial court may consider when sentencing a defendant. The primary factors are the gravity of the offense, the character of the offender, and the need for protection of the public. *Id.* at 623, 350 N.W.2d at 639.

In imposing sentence the trial court enumerated the following factors which it had taken into consideration: Teynor's refusal or inability to accept responsibility for his actions in confining and restraining his

children, the fear and terror to which he subjected his children, the need to protect Janice from him, and the fact that it was unlikely considering Teynor's previous record that he would abide by any terms of probation the court might impose. In particular, the court's decision indicates its reliance upon the following factors delineated in *Harris,* 119 Wis. 2d at 623–24, 350 N.W.2d at 639: the gravity of the offense, Teynor's personality, character and social traits, the pre-sentence investigation, the degree of Teynor's culpability, his demeanor at trial, his lack of remorse, repentance and cooperativeness, and his need for close rehabilitative control. We conclude that the trial court properly exercised its discretion in imposing sentence on Teynor and that the sentences imposed do not shock public sentiment so as to constitute cruel and unusual punishment.

*By the Court.*—Judgment and order affirmed.