STATE of Wisconsin, Plaintiff-Respondent,

v.

C.V.C., Defendant-Appellant.†

Court of Appeals

*No. 88-2328-CR. Submitted on briefs July 19, 1989.—Decided November 1, 1989.*

(Also reported in 450 N.W.2d 463.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the brief of *Charles W. Jones* of Bayside.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Donald J. Hanaway,* attorney general, and *Christopher G. Wren,* assistant attorney general.

Before Brown, P.J., Scott and Nettesheim, JJ.

NETTESHEIM, J. C.V.C.[1] appeals from judgments convicting him of false imprisonment, attempted second-degree sexual assault and two counts of second-degree sexual assault. C.V.C. was sentenced to a total of twenty-five years in prison, with the last ten years of the sentence stayed and probation ordered.

---

[1] We have masked the defendant's identity in order to shield the victim of this sensitive crime.

On appeal, C.V.C. argues that the evidence was insufficient to support the conviction for false imprisonment because the victim could have left the imprisonment scene on several occasions. We conclude that the victim was not required to take steps dangerous to herself or offensive to a reasonable sense of decency or personal dignity to free herself in order for the state to prove restraint or confinement on C.V.C.'s part. Because the evidence demonstrates that these conditions existed, the jury's determination that the victim was restrained or confined is upheld.

C.V.C. also argues on appeal that the victim's testimony of the sexual assaults was inherently incredible; that evidence of prior acts was erroneously admitted; and that the trial court abused its sentencing discretion. We reject these additional arguments and affirm the judgments.

The nature of C.V.C.'s claims requires that we set forth the facts of this case in some detail. On the weekend of April 16 and 17, 1988, C.V.C., his wife, L.C., and their two children, ages five and two, were together at their residence. On Saturday evening, after the children were in bed, C.V.C. and L.C. watched three x-rated movies, used some cocaine, and discussed their marital problems, especially C.V.C.'s belief that L.C. had engaged in sexual intercourse on their kitchen table with a man named Tom five years earlier. Between 4:00 a.m. and 5:00 a.m. Sunday morning, L.C. and C.V.C. went to sleep. Thereafter, C.V.C.'s and L.C.'s testimony about ensuing events is in sharp conflict.

L.C. testified that she and C.V.C. woke up around 10:00 a.m. Sunday and that C.V.C. again used cocaine and drank alcohol throughout the rest of that day. That morning C.V.C. again accused L.C. of having sex with Tom. C.V.C. eventually brought out a tape recorder on

which he taped for an hour and a half his questions and L.C.'s responses. L.C. continued to deny C.V.C.'s accusations.

After C.V.C. put the recorder away, L.C. made lunch for the children. C.V.C., however, continued to accuse L.C. of lying. L.C. then left the children in the kitchen and went to talk with C.V.C., who then told her that maybe a .357 Magnum in her mouth would bring out the truth. Out of fear that C.V.C. would get the gun from the cabinet, L.C. told C.V.C. what she thought he wanted to hear—that she had in fact engaged in intercourse with Tom in 1983. C.V.C. then followed L.C. into the kitchen, and in the children's presence grabbed L.C. around the neck, shook her and kicked her in the pelvic area, causing her to fall to the floor.

A short while later C.V.C. asked L.C. to come into the living room. L.C. complied. C.V.C. told the five-year-old child that his mother was a whore and slapped L.C. He then told L.C. that he would devise a "punishment" for her, with which she would have to comply if she wished to stay with her children. He told her she could leave, but that she could not take the children with her. L.C., afraid that she would not see her children again and afraid to leave the children alone with C.V.C., told C.V.C. she would accept the "punishment."

That afternoon and evening, C.V.C. continued his tirade, threatening to cut off L.C.'s clitoris with a scissors and to staple her vagina closed. During the afternoon two of C.V.C.'s friends came to the door of the house, but L.C. sent them away at C.V.C.'s direction. However, L.C. did request the second visitor, Don Baumgartner, to tell his wife that she needed help. Baumgartner shouted into the house "what's going on out there," so L.C. terminated the conversation. L.C. also tried to send a note to a neighbor via the five-year-

old child, but the plan failed when the child could not find the neighbor's child. Afraid that discovery of her attempt to obtain help would anger C.V.C. further, L.C. took the note back from the child.

That evening L.C. went to the store to buy some food and returned to the home. After the children were in bed, C.V.C. told L.C. that her punishment would entail performing various acts of prostitution and going to Lake Geneva to watch C.V.C. "turnout" Tom and cut off Tom's penis. Threatening to beat her, C.V.C. then instructed L.C. to strip and have intercourse with him on the kitchen table. L.C. resisted, but C.V.C. held her belly-down on the table and put his penis in her vagina. He then forced L.C. into the living room where he threatened her with bodily intrusion with a beer can. He then shaved off L.C.'s pubic hair with his mustache trimmer. L.C. then fell asleep in the bedroom, but was awakened by C.V.C. who beat her about the face and choked her. C.V.C. then forced L.C. to lie on the floor "like a dog," kicked her repeatedly and threatened to hit her with a glass juice jar.

Eventually, C.V.C. instructed L.C. to get dressed, but he continued pacing around the room, hitting L.C. in the face each time he walked past her. C.V.C. again instructed L.C. to strip, telling her that he was the "whore-master," and that he was going to teach her how to be a good whore so he could make a lot of money off of her. Fearful that C.V.C. would begin beating her again, L.C. complied. C.V.C. forced L.C. to lie on her back with her legs over her head, and slapped her vagina with his penis. He then attempted anal intercourse with L.C., and when that failed he had vaginal intercourse with her. After awhile both C.V.C. and L.C. fell asleep.

Monday morning, C.V.C. again forced L.C. to have intercourse with him. At 7:20 a.m., L.C. sent their son to

school. An hour later she woke C.V.C., who instructed her to find a sitter for the children for two days so they could go to Lake Geneva. He also told her to go to his place of business to admit an employee, pick up one of his guns and get some money for the trip. L.C. went to C.V.C.'s business with their two-year-old child. After opening the shop, she called C.V.C. and told him she would pick up their five-year-old child from school and take both children to the sitter. L.C. picked up the child from school, but instead of going to the sitter she went to the police station and reported the events of that weekend. C.V.C. was located seven days later and arrested.

At the jury trial, over C.V.C.'s objection, evidence was introduced that two years earlier L.C. had left C.V.C. and taken their two children to live with her parents. At that time C.V.C. had threatened L.C. over the phone that if she would not return voluntarily he would come to her parents' home to get the children and there would be a "bloodbath." L.C. called the police and several hours later C.V.C. was arrested on his way to L.C.'s parents' house in possession of two loaded firearms.

The jury found C.V.C. guilty of second-degree sexual assault (two counts), attempted second-degree sexual assault and false imprisonment. The trial court sentenced C.V.C. to ten years' imprisonment for one of the assaults, and a five-year consecutive term for the attempted assault, for a total of fifteen years. The court also imposed a two-year term for the false imprisonment, concurrent with a ten-year term for the other assault, for a total of ten years. The court ordered this ten-year sentence consecutive to the fifteen-year sentence, but stayed this ten-year term and ordered probation.

On appeal, C.V.C. first argues that there was insufficient evidence of confinement or restraint within the

meaning of the false imprisonment statute, sec. 940.30, Stats., because L.C. had physical means of escape available to her at various times during the episode.

Criminal false imprisonment requires "confinement or restraint" of the victim. *State v. Teynor,* 141 Wis. 2d 187, 203, 414 N.W.2d 76, 82 (Ct. App. 1987). The jury was instructed that "[i]f there is some reasonable means of escape, there is no confinement or restraint." Wis J I—Criminal 1275. C.V.C., relying on the Restatement of Torts, interprets this to mean that a person must take advantage of a means of escape unless "circumstances are such as to make it offensive to a reasonable sense of decency or personal dignity." *See Restatement (Second) of Torts* sec. 36 comment a (1978).

C.V.C. argues that L.C. had several opportunities during the episode to effectuate an escape without offending a reasonable sense of decency or personal dignity. He argues that since L.C. was capable of sending a note for help with her son when he went outside to play, she could have just as easily instructed him to take the note directly to a neighbor. He also faults L.C. for failing to more strongly plead for help from Mr. Baumgartner when he visited the house that weekend, for failing to call a friend, or to leave the house while C.V.C. slept early Monday morning.

We turn first to a determination of what constitutes "a reasonable means of escape" within the meaning of the false imprisonment jury instruction, Wis J I—Criminal 1275.[2] C.V.C.'s argument relies upon a por-

---

[2]The state takes issue with Wis J I—Criminal 1275 and its statement that "[i]f there is some reasonable means of escape, there is no confinement or restraint." The state argues that this language can be interpreted to mean that if there is no escape, there can be no restraint or confinement. Instead the state argues

tion of *Restatement (Second) of Torts* sec. 36 comment a. However, we view the following portion of comment a to be a more complete statement of when it is reasonable for a victim not to attempt escape:

> Since the actor has intended to imprison the other, the other is not required to run any risk of harm to his person or to his chattels or of subjecting himself to any substantial liability to a third person in order to relieve the actor from a liability to which his intentional misconduct has subjected him. So too, even though there may be a perfectly safe avenue of escape, the other is not required to take it if the circumstances are such as to make it offensive to a reasonable sense of decency or personal dignity.

*Id.*

This language was adopted by the Wisconsin Supreme Court in *Herbst v. Wuennenberg,* 83 Wis. 2d 768, 778-79, 266 N.W.2d 391, 396 (1978). In *Herbst,* a civil case for the tort of false imprisonment, the court stated that the plaintiffs "were not required to obtain their freedom by taking steps dangerous to themselves or offensive to their reasonable sense of decency or personal dignity." *Id.* (citing *Restatement (Second) of Torts* sec. 36). While recognizing that *Herbst* is a civil case, we find its language helpful in determining whether a victim of the crime of false imprisonment had "reasonable means of escape." *See* Wis J I—Criminal 1275. There-

---

that a failure to escape should be but one fact for the jury to weigh (along with all other relevant facts) in determining whether restraint or confinement occurred. Because we reject C.V.C.'s argument that nonconfinement or restraint occurred under his interpretation of the jury instruction, we do not address the state's argument on this question.

fore, we will review C.V.C.'s claim of insufficiency of the evidence in light of the *Herbst* standard.

Upon a challenge to the sufficiency of the evidence, the test we apply is whether the evidence is so insufficient in probative value and force that, as a matter of law, no reasonable jury could have found guilt beyond a reasonable doubt. *State v. Pankow,* 144 Wis. 2d 23, 30, 422 N.W.2d 913, 914 (Ct. App. 1988). We examine the evidence before the jury and reasonable inferences therefrom in the light most favorable to the verdict. *Id.*

At trial, L.C. testified that she was afraid to attempt an escape:

> Because of my children. I love my children very much. I was afraid to leave them in the atmosphere. I was very afraid of the threat he used, that he would—that I would not make it to the end of the driveway. Because of all the loaded weapons he had sitting on top of the gun cabinet, I knew he would be able to reach one of the guns before I could get out very fast.

Based upon this testimony and our review of the entire record, we conclude that the evidence is more than sufficient to support the jury's conclusion that L.C. had no reasonable means of escape. There is abundant evidence that L.C. feared that an attempted escape would endanger her own safety and that of her children. There is also evidence that L.C.'s fears were reasonable, based upon C.V.C.'s threats and violent behavior, prior experiences with C.V.C. and the availability of weapons in the house. L.C. was not required to attempt a means of escape that was dangerous to herself in order for the state to establish that she had been falsely imprisoned. *See Herbst,* 83 Wis. 2d at 778–79, 266 N.W.2d at 396. Nor was she required to subject her children to danger, a

concept which is offensive to a reasonable sense of decency. *See id.*

The evidence recited earlier presented a fact question for the jury as to whether L.C. had a "reasonable means of escape." *See* Wis J I—Criminal 1275. It is the jury's duty to judge the credibility of the witnesses. *Teynor,* 141 Wis. 2d at 205, 414 N.W.2d at 83. The evidence, viewed in the light most favorable to the conviction, supports the jury's determination that L.C.'s escape attempts were reasonable under the circumstances and that she had no other reasonable means of escape. We conclude that the evidence was sufficient to allow a reasonable jury to find beyond a reasonable doubt that C.V.C. had confined or restrained L.C. We therefore affirm the conviction for false imprisonment.

The second issue is whether there was sufficient evidence for the jury to find C.V.C. guilty of second-degree sexual assault and attempted second-degree sexual assault. C.V.C. argues that L.C.'s testimony was inherently incredible; therefore he reasons that the evidence was insufficient to support these convictions. We disagree.

Again, the test we apply is whether the evidence is so insufficient in probative value and force that, as a matter of law, no reasonable jury could have found guilt beyond a reasonable doubt. *Pankow,* 144 Wis. 2d at 30, 422 N.W.2d at 914. We will examine the evidence in the light most favorable to the conviction. *Id.* This court will only substitute its judgment for that of the trier of fact when the fact finder relied upon evidence that was inherently or patently incredible—that kind of evidence which conflicts with the laws of nature or with fully-

established or conceded facts. *State v. Daniels,* 117 Wis. 2d 9, 17, 343 N.W.2d 411, 415–16 (Ct. App. 1983).

C.V.C. contends that L.C. had a motive to falsify her testimony regarding the sexual assaults. This motive, he argues, combined with L.C.'s conduct over the course of the weekend, rendered her testimony incredible. We will address each of these arguments separately.

In some situations where the prosecuting witness had an apparent motive to falsify, the supreme court has found such accusatory testimony incredible. *See Syvock v. State,* 61 Wis. 2d 411, 416, 213 N.W.2d 11, 14 (1973). We do not read the supreme court's statement in *Syvock,* however, to mean that every time a prosecuting witness has an apparent motive to falsify, the witness' testimony is incredible as a matter of law. Judging the credibility of a witness is a matter left solely to the fact finder. *Teynor,* 141 Wis. 2d at 205, 414 N.W.2d at 83.

At trial, C.V.C. raised the inference that L.C. had a motive to falsify. C.V.C. testified that when L.C. admitted to the affair with Tom, C.V.C. told her that he would be seeking a divorce and custody of their children. Therefore, C.V.C. asserts that L.C. feared losing her children to him, and thus lied about the assaults. We cannot agree that this inference rendered L.C.'s testimony incredible as a matter of law. Accordingly, we defer to the jury's assessment of L.C.'s credibility and affirm the jury's verdict.

We turn then to C.V.C.'s argument that L.C.'s testimony was patently incredible because her conduct was "[n]ot the usual and natural conduct of one in her alleged position." C.V.C. garners support for his position from the supreme court decision in *Ganzel v. State,* 185 Wis. 589, 201 N.W. 724 (1925). In *Ganzel,* the court reversed

158

an incest conviction because the victim's conduct subsequent to the alleged rape was not "the usual and natural conduct of an outraged woman." *Id.* at 591, 201 N.W. at 725. The supreme court concluded that the victim's "inconsistent" conduct rendered her testimony incredible as a matter of law. *Id.* at 592, 201 N.W. at 725.

C.V.C. argues that L.C.'s relatively calm appearance when she answered the door on Sunday and her failure to call the police when she went grocery shopping Sunday night were not the usual and natural conduct of someone who had just been sexually assaulted. This argument fails for the simple reason that L.C. had not yet been sexually assaulted when the visitors came to the house and when she left the house to go to the store for food Sunday night. C.V.C., however, clings to this line of argument, pointing to early Monday morning, when L.C. was getting one of the children ready for school and C.V.C. was sleeping, as a time when L.C. should have fled the house with the children. Because L.C. waited several more hours before going to the police, C.V.C. contends that L.C.'s conduct was unusual for one in her situation and thus her testimony is incredible as a matter of law under *Ganzel.*

██

We doubt that the supreme court's language in *Ganzel* is still viable in this more informed age regarding expected conduct of sexual assault victims. Nonetheless, we cannot find that L.C.'s testimony about the sexual assaults is rendered patently incredible or inconsistent because she failed to report the incident the moment C.V.C. again fell asleep Monday morning. C.V.C. had threatened the day before that if L.C. tried to leave with the children she would not make it out of the driveway. Loaded guns were in the house. C.V.C. had just been awake that morning and had just concluded an assault

upon L.C. In light of these facts, we conclude it was not unreasonable for L.C. to bide her time before removing herself and the children to safety. We conclude that L.C.'s testimony is not incredible as a matter of law and affirm the convictions for sexual assault and attempted sexual assault.

The third issue on appeal is whether the trial court erred when it admitted "other acts" evidence. At trial, the state offered evidence about an incident two years earlier in which C.V.C. had threatened L.C.'s life and was later apprehended in possession of two loaded guns on his way to the city where L.C. and their children were located. Over C.V.C.'s objection, the trial court admitted the evidence on the grounds that it went to L.C.'s state of mind at the time of the assaults. The court reasoned:

> One of the issues, again, that the District Attorney must prove is whether or not there was consent, in fact. And in order for the jury to decide that, they must know what operative factors were present in the mind of [L.C.] at the time the events allegedly occurred. And if this woman was scared to death because of the prior relationship of these folks and some allegedly violent acts which he committed in the past, that is something that the jury needs to know in order to make a correct decision about what this woman was thinking at the time this event occurred.

On this basis, the trial court overruled C.V.C.'s objections, but thrice instructed the jury as to the limited purpose for which this testimony was being offered—to show L.C.'s state of mind on the issue of whether she consented to the acts of sexual intercourse, not to show C.V.C.'s character.

160

In reviewing evidentiary rulings, the question on appeal is whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of the record. *State v. Alsteen,* 108 Wis. 2d 723, 727, 324 N.W.2d 426, 428 (1982). We will not find an abuse of discretion if there is a reasonable basis for the trial court's determination. *Id.*

C.V.C. contends that the trial court abused its discretion by failing to make a reasonable inquiry and examination of the underlying facts. *See State v. Mink,* 146 Wis. 2d 1, 13-14, 429 N.W.2d 99, 104 (Ct. App. 1988). Had the underlying facts been examined, C.V.C. asserts the court would have ruled that his prior acts had little probative value and that evidence of the acts served only to encourage the jury to find that C.V.C. acted in conformity with his purported bad character.

C.V.C. faults the trial court for neglecting to consider the other evidence that the prosecution had available to show L.C.'s state of mind. Apparently, C.V.C. believes that there was enough "other" evidence to show L.C.'s state of mind, and that evidence of this particular act was "piling on" unnecessary evidence. Thus, he concludes, the prejudicial impact of this testimony outweighed its probative value.

As with all evidentiary rulings, the question of whether other acts evidence is admissible is addressed to the trial court's discretion. *Id.* at 13, 429 N.W.2d at 103-04. The trial court must apply a two-prong test in determining whether the other crimes evidence is admissible. *State v. Friedrich,* 135 Wis. 2d 1, 19, 398 N.W.2d 763, 771 (1987). First, the trial court must determine whether the evidence fits within one of the exceptions in sec. 904.04(2), Stats. *Friedrich,* 135 Wis. 2d at 19, 398

N.W.2d at 771. Second, the trial court must exercise its discretion to determine whether any prejudice resulting from such evidence outweighs its probative value. *Id.* Implicit in the foregoing analysis is the requirement that the other crimes evidence is relevant to an issue in the case. *Id.*

However, the listing of circumstances under sec. 904.04(2), Stats., for which evidence is relevant and admissible is not exclusionary but, rather, illustrative. *State v. Shillcutt,* 116 Wis. 2d 227, 236, 341 N.W.2d 716, 720 (Ct. App. 1983), *aff'd,* 119 Wis. 2d 788, 350 N.W.2d 686 (1984). An "accepted basis for the admissibility of evidence of other crimes arises when such evidence 'furnishes part of the context of the crime' or is necessary to a 'full presentation' of the case." *Id.*

The question of L.C.'s state of mind and the reasonableness of her actions permeated the entire trial in this case. Indeed, it formed the essential basis of C.V.C.'s defense. We conclude that the trial court properly admitted the evidence. The record shows that the trial court weighed the prejudicial effect of the evidence against its probative value before concluding that its admission was necessary to the issue of L.C.'s consent. The court's reasoning and decision properly took into consideration the applicable law and facts of the record, and its instructions to the jury properly limited the jury's use of the evidence.[3]

Last, C.V.C. argues that the trial court abused its sentencing discretion. He contends that the court gave

---

[3]Furthermore, C.V.C. never expressly argued to the trial court the "piling on" argument he makes on appeal. This aspect of the issue is waived for purposes of appeal. *Zeller v. Northrup King Co.,* 125 Wis. 2d 31, 35, 370 N.W.2d 809, 812 (Ct. App. 1985).

too much weight to his alleged bad character, and thereby imposed an excessive sentence.

Sentencing is within the sound discretion of the trial court and we will not reverse absent an abuse of that discretion. *State v. Roubik,* 137 Wis. 2d 301, 310, 404 N.W.2d 105, 108 (Ct. App. 1987). An abuse of discretion will be found only where the sentence is excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances. *Ocanas v. State,* 70 Wis. 2d 179, 185, 233 N.W.2d 457, 461 (1975).

The three primary factors which the trial court should consider in sentencing are: gravity of the offense, character of the offender, and need for public protection. *See McCleary v. State,* 49 Wis. 2d 263, 274, 182 N.W.2d 512, 518 (1971). However, the weight to be given to each of the relevant factors is particularly within the wide discretion of the trial court. *Ocanas,* 70 Wis. 2d at 185, 233 N.W.2d at 461.

In the present case, we conclude that the trial court adequately considered the three primary sentencing factors before imposing the sentences. The transcript of the sentencing proceeding is replete with references to the enormity and severity of C.V.C.'s acts, the repugnant nature of his behavior and the terror inflicted upon both L.C. and the children.

While the trial court may have placed more emphasis on the defendant's character than the other relevant factors when imposing sentence, it is completely within the trial court's discretion to do so. *Id.* There has been no showing that the trial court based its determination

163

upon factors improper or irrelevant to sentencing, or that the sentences were influenced by improper motives. *See id.* No abuse of discretion is shown.

*By the Court.*—Judgments affirmed.