STATE of Wisconsin, Plaintiff-Respondent,

v.

Randy S. SIMPLOT, Defendant-Appellant.†

Court of Appeals

*No. 92–1520–CR. Submitted on briefs June 4, 1993.—Decided November 24, 1993.*

(Also reported in 509 N.W.2d 338.)

†Petition to review denied.

385

For the defendant-appellant the cause was submitted on the brief of *Michael D. O'Brien* and a reply brief by *R. Alan Bates* of *Feingold, Bates & Sultze* of Janesville.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle*, attorney general, and *James M. Freimuth*, assistant attorney general.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J. Randy Simplot appeals from a judgment convicting him as a party to the crimes of

kidnapping (while armed and concealing identity) and armed burglary (while concealing identity)[1] and from an order denying his motions for postconviction relief.

The charges stemmed from his participation in breaking into the home of his sister's former live-in companion, Brent Bradley, and taking away the couple's three young children.

Simplot argues on appeal that: (1) the evidence was insufficient to convict him of kidnapping and armed burglary; (2) the trial court erred in rejecting his proposed jury instruction that he was immune from prosecution for kidnapping if he was acting on behalf of the children's mother; (3) the court improperly responded to a question posed by the jury during deliberations; (4) he was denied a fair hearing on the charges because of several errors in the conduct of the trial; and (5) he is entitled to a new trial on grounds of newly discovered evidence. We reject his arguments and affirm the judgment and order.

## I. FACTS

Simplot was tried jointly with his sister, Lisa Oliver, the children's mother. Lisa and Brent Bradley had lived together for several years and, during their relationship, paternity orders were entered declaring Bradley to be the father of their three children and granting legal custody to Lisa. She eventually married Mark Oliver and moved to Indiana with him.

In October, 1990, when the incident giving rise to the charges occurred — and for reasons that are not entirely clear in the record — the children had been

---

[1] He was acquitted on charges of armed robbery and aggravated battery.

living with Bradley for nearly a year.[2] On the weekend of October 19, Lisa, Simplot and Mark Oliver's brother, Michael, drove from Indiana to Bradley's residence in Beloit, ostensibly in an effort to pick up the children. When Lisa was advised by Beloit police officers that she would have to wait until Monday to speak to someone at the district attorney's office about taking the children, she and the others returned to Indiana.

The following evening, a Saturday, Lisa and Simplot, along with Mark and Michael Oliver and a fourth man, Edwin Brooks, returned to Beloit and drove to Bradley's house. Simplot, Mark Oliver and Brooks got out of the car and entered the home through a rear entrance. Mark Oliver and Brooks were carrying guns and wore masks. While Simplot and Mark Oliver remained in the kitchen and dining room to avoid being recognized, Brooks entered the living room, where Bradley was watching television with the three children, another child of his from a former marriage, and one of the children's friends. Brooks ordered Bradley to lie on the floor and began beating him with a shotgun and a barbell he apparently found in the house. Bradley was then locked in a closet and, while Brooks took a .22-caliber pistol belonging to Bradley and cash from his wallet, Simplot and Mark Oliver took the three children out to the car where Lisa and Michael Oliver were waiting. They immediately left for Indiana.

Bradley, bleeding from his injuries, ran to a neighbor's house to call the police, and Simplot and the others were stopped by state patrol officers a short time

[2] Bradley testified that he had taken physical custody of the children because they were being abused by Lisa's present husband, while Lisa maintained that she had made several unsuccessful attempts to retrieve the children from Bradley during that period of time.

later in northern Illinois. The officers found an unloaded automatic pistol on the rear seat of the car next to Simplot, a .22-caliber pistol underneath the front passenger seat and an unloaded sawed-off shotgun in the rear hatchback compartment. Shotgun shells and bullets were also found in the car and each of the five adults was arrested.

Simplot and Lisa were tried jointly on several charges. Lisa was acquitted on all charges and, as indicated, Simplot was convicted of being a party to kidnapping and armed burglary and was sentenced to ten years in prison. Other facts will be discussed in the body of the opinion.

## II. THE KIDNAPPING
## INSTRUCTION: IMMUNITY

Simplot maintains that he cannot be convicted of kidnapping the children because he was acting on behalf of their mother and thus had a legal right to take them. We consider this argument first.

Specifically, Simplot challenges the trial court's rejection of a proposed jury instruction stating, in effect, that because a parent with legal custody of a child cannot be found guilty of kidnapping, neither can "a person acting on behalf of" such a parent.

■

At common law, even in the absence of a custody order, a parent does not commit the crime of kidnapping by taking the child from the other parent. *See* Annotation, *Kidnapping or Related Offense By Taking or Removing of Child By or Under Authority of Parent*

*or One in Loco Parentis*, 20 A.L.R.4th 823, 828-30 (1983).[3]

The annotation, which is, in essence, the only authority offered by the parties, also suggests that a majority of courts considering the issue have held that one who acts as an agent of a parent, or assists the parent in taking custody of a child, may not be held criminally liable for kidnapping unless the parent from whom the child was taken has a court order granting him or her custody. *Kidnapping*, 20 A.L.R.4th at 831-32. Only two of the cases cited for the proposition were decided within the last forty years: *State v. Walker*, 241 S.E.2d 89 (N.C. Ct. App. 1978), and *State v. Edmiston*, 602 P.2d 282 (Or. Ct. App. 1979).

In *Walker*, the child's grandfather and father went to the child's school, picked him up as he left the school bus and took him to the father's car. The court concluded that, because there was no court order granting custody to the child's mother, and because the father had consented to the grandfather's participation in taking the child, the grandfather could not be convicted of abducting the child. *Walker*, 241 S.E.2d at 91. The

---

[3] We recognized the existence of the rule in *dicta* in *State v. Teynor*, 141 Wis. 2d 187, 414 N.W.2d 76 (Ct. App. 1987), where the defendant was charged with false imprisonment for abducting his estranged wife and their children. Teynor claimed he could not be convicted of abducting or falsely imprisoning the children because he was their father and thus had the right to direct their activities. He also argued that the temporary order granting custody to his wife was "not legally sufficient to deprive him of his authority to confine or restrain his children." *Id.* at 201, 414 N.W.2d at 81. We rejected the argument, holding that the temporary order was sufficient to give the mother, not the defendant, the right to direct the activities of the children. *Id.*

*Edmiston* court, without stating the defendant's relationship to the child or engaging in any discussion of the circumstances of the taking, also held that the defendant who, acting at the direction of the child's father, took the child from its mother, could not be guilty of kidnapping because he acted with the lawful custodian's consent. *Edmiston*, 602 P.2d at 283-84.[4]

The rationale of cases adopting the minority view that the parent's immunity does *not* extend to the agent was also discussed in *Edmiston*:

> The state's position [that the parent's "agent" may be found guilty of kidnapping despite the immunity enjoyed by the parent] finds support in the decisions of several courts which have held agents guilty of kidnapping while exempting the parent at whose instance the taking occurred. The distinction rests on the presumption that the danger to the child is substantially less where the person doing the taking is a parent likely to have the best interests of the child in mind. Further, the parent from whose custody the child is taken will recognize the taker, thereby lessening that parent's mental anguish and reducing the likelihood of breaches of the peace inherently probable where the child is taken by an unrecognized, alleged agent of the parent. *Edmiston*, 602 P.2d at 283 (citations omitted).[5]

---

[4] It appears that neither parent in *Edmiston* had been granted legal custody of the child. The court therefore concluded that, under the terms of the kidnapping statute, the father was a "lawful custodian" because his legal relationship to the child had not been altered by a court order.

[5] The *Edmiston* court, noting the merit of the minority position, concluded that the Oregon statute's requirement that the taking be without the lawful custodian's consent could not be

In *Wilborn v. Superior Court*, 337 P.2d 65 (Cal. 1959), the California court, holding that the agent did not share the parent's immunity, elaborated on the point:

> If a child be taken or enticed away from one parent by the other parent, the mental anxiety of the parent who loses the child would not ordinarily be nearly so great as where the child passes into the hands of one having no parental obligations toward the child. Thus, it would seem that whatever may be the right of one parent, in the absence of an order for child custody, to invade the possession of the other to take or entice away their mutual offspring, such right may not be delegated to an agent. To hold otherwise would result in untold confusion and provoke many possible breaches of the peace in that the parent having possession of the child would be at the mercy of persons acting as alleged agents of the other parent and claiming immunity from prosecution under the statute because of the personal right of their principal. Such consequences would not promote the interests of the parents, the child or the public welfare. *Wilborn*, 337 P.2d at 66 (citation omitted).

Similarly, in *State v. Stocksdale*, 350 A.2d 539 (N.J. Super. Ct. Law Div. 1975), the New Jersey court, relying on *Wilborn*, concluded that a parental exemp-

met where the defendant was acting at the lawful custodian's direction. *Edmiston*, 602 P.2d at 283-84.

We note that, unlike the Oregon law, the Wisconsin kidnapping statute, sec. 940.31(1), Stats., does not limit the definition of the offense to the taking of a child without consent of the lawful custodian. It provides that "[w]hoever," by use of force or threat of imminent force, carries another from one place to another without his or her consent is guilty of the offense.

tion in a kidnapping statute would not apply to a third party who conspired with the child's father to take the child away. The defendant in *Stocksdale* was a private investigator hired by the child's father to regain custody of the couple's child. The child was living with her mother and grandparents. While the mother was at work, the defendant lured the grandfather away from the house with a telephone call telling him his daughter had been injured in an automobile accident. The defendant then went to the home and distracted the grandmother at the front door with tales of the daughter's alleged accident, while the father entered the house through the rear and "spirited away his infant daughter . . . ." *Id.* at 542.

The court, acknowledging that "[t]here is much to compel a holding that a relative or close friend should not be guilty of kidnapping when, in good faith, he or she assists a distraught parent in one of these unfortunate custody struggles," *Stocksdale*, 350 A.2d at 543, went on to state, however, that:

> This case, involving this defendant, is hardly a "good faith" situation. Defendant's interest in this matter is purely pecuniary. He was paid by an irate father to help wrest custody from the mother and to assist the father in removing the child to a faraway jurisdiction. Public policy mandates against a finding which would encourage the type of activity engaged in by this defendant. There is little to commend a holding which would encourage or support the movement across state lines of people engaged in the business of resolving custody disputes by baby snatching. *Id.*[6]

---

[6] The court's remarks concern the offense of kidnapping. Because, however, the state had not charged Stocksdale with kidnapping, the court was left only with the charge of breaking

It is true that in *Wilborn* no custody order had been entered at the time of the taking, whereas in this case Lisa had orders granting her custody of the children — even though, as we have noted, the children had been in Bradley's physical custody for nearly a year. We see no difference in principle, however, for the same considerations discussed in *Wilborn, Stocksdale* and similar cases are equally applicable here.

There is no doubt that child snatching carries the potential for emotional, and sometimes physical, harm to the child and to the parent from whom the child is taken, whether the taker is acting on behalf of a parent with a custody order or whether no order exists. Indeed, this case presents the prime example: while Simplot is the children's uncle, the snatching in which he participated was anything but a good-faith endeavor. As we have noted above, it was a premeditated, armed, masked and violent incident. Simplot himself did not enter the living room, choosing instead to hide in the kitchen so as to not be recognized. As a result, neither the children nor Bradley were aware that a "family" member was present when armed and masked strangers entered their house, ordered Bradley to the floor and began beating him bloody with a

and entering with intent to kidnap. And, because there was no evidence that Stocksdale had ever entered the grandparents' house, the court was constrained to dismiss that charge as well.

As a result, the court's discussion is largely *dicta*. It is true, however — at least in Wisconsin — that when a court "intentionally takes up, discusses, and decides a question germane to, though not necessarily decisive of, the controversy, such decision is not a *dictum* but is a judicial act of the court . . . ." *State v. Kruse*, 101 Wis. 2d 387, 392, 305 N.W.2d 85, 88 (1981). Even so, we refer to *Stocksdale* for its reasoning, not as binding precedent.

shotgun and a barbell. As in *Stocksdale*, Simplot's actions in this case "hardly portray [him] as a prime candidate for compassion." *Stocksdale*, 350 A.2d at 541. In short, there is nothing here to commend a holding which would encourage or support this type of violent, "vigilante" conduct. Indeed, we agree with the *Stocksdale* court that to do so would be contrary to the best interest of the children, the parents and the public.

We are not unmindful of the frustrations felt by parents in situations where the legal system seems to them to be either inadequate or institutionally unable to deal promptly and fairly with problems of child custody. But this is the extreme case: it is an example of self-help gone wrong, and conduct such as that exhibited by Simplot and his accomplices cannot be countenanced under any circumstances.[7]

We thus adopt the so-called "minority" view which refuses to extend the parent's immunity to an agent in cases such as this. In doing so, we realize that many such takings may be undertaken peaceably by a relative known to the child acting on behalf of a parent entitled to custody. We cannot escape the conclusion, however, that adoption of a rule that would immunize conduct such as that exhibited by Simplot and his associates in this case would be contrary to Wisconsin's historic commitment to the rule of law and the protection and promotion of the best interests of its children.

---

[7] Apart from our refusal to extend the parental privilege to Simplot on the facts of this case, the record also suggests that Simplot may have been acting more akin to the "principal" in the kidnapping than as his sister's agent. Lisa consistently testified that she was unaware that the children would be taken from the Bradley residence that night, and, as we have noted, the jury acquitted her of participating in the kidnapping.

## III. SUFFICIENCY OF THE EVIDENCE

Simplot, joined by Lisa, moved to dismiss the charges at the conclusion of the state's case, and the trial court denied the motions. The trial proceeded, and although Lisa's counsel took the lead in presenting most of the defense witnesses, Simplot's attorney participated to a substantial degree, pursuing, along with Lisa, a defense of coercion and privilege.[8] Defense counsel made his opening statement after the denial of the dismissal motion, presented at least one witness of his own, examined other defense witnesses called by Lisa, requested special jury instructions and argued his position to the jury at the conclusion of the evidence.

Simplot argues on appeal that his motion to dismiss should have been granted because there was insufficient evidence at the conclusion of the state's case to find guilt beyond a reasonable doubt, and he maintains that we are limited to the evidence presented at the time the motion was made and may not consider testimony of any defense witnesses or witnesses called by the state on rebuttal.

Taking the latter point first, the supreme court held in *State v. Kelley*, 107 Wis. 2d 540, 544, 319 N.W.2d 869, 871 (1982), that "where a defendant moves for a dismissal or a directed verdict at the close of the prosecution's case and when the motion is denied, . . . the introduction of evidence by the defendant, if the *entire* evidence is sufficient to sustain a

---

[8] As we have noted — and as will be discussed in greater detail below — Lisa claimed that, as the children's parent, she could not be prosecuted for kidnapping; Simplot maintained that, as Lisa's agent, neither could he.

conviction, waives the motion to direct." (Emphasis in original.)[9] Here, because Simplot called at least one witness himself, examined witnesses called by his codefendant and otherwise participated in the trial as discussed above, "on review, [we] must examine all the evidence in determining whether it is sufficient to sustain the conviction." *Kelley*, 107 Wis. 2d at 544, 319 N.W.2d at 871.[10]

We analyze sufficiency-of-the-evidence claims under the following rules:

> [I]n reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. If any possibility exists that the trier of fact

---

[9] The *Kelley* court explained the distinction as follows:

[T]he denial of a motion to dismiss at the close of the prosecution's case presents the defendant with a difficult choice. . . . [H]e has the option of either not presenting any evidence on his behalf and preserving the ruling for appeal or abandoning his motion and introducing his defense. Should [he] choose the first option, the appellate court can consider only the state's evidence in determining whether it was sufficient to support the defendant's guilt beyond a reasonable doubt. If the defendant chooses the second option and subsequently appeals his conviction, the appellate court must review all the evidence in determining whether it is sufficient to sustain the conviction. *Kelley*, 107 Wis. 2d at 545, 319 N.W.2d at 871-72 (citations omitted).

[10] Simplot's reliance on *Bere v. State*, 76 Wis. 2d 514, 251 N.W.2d 814 (1977), is misplaced. As the *Kelley* court noted, *Bere* involved the *trial court's* obligations when faced with a motion to dismiss, not the appellate court's. *Kelley*, 107 Wis. 2d at 545, 319 N.W.2d at 872.

could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it. *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752, 757-58 (1990) (citation omitted).

Simplot was charged as party to the crime of kidnapping[11] and thus could be found guilty if he either (a) directly committed the offense, (b) intentionally aided and abetted its commission, or (c) conspired with another to commit it. Section 939.05(2), Stats. And it is not necessary that the jury concur in a single view of the event: unanimity is not required with respect to the alternative means or ways in which one can be convicted as party to a crime. *Holland v. State*, 91 Wis. 2d 134, 142-43, 280 N.W.2d 288, 292-93 (1979), *cert. denied*, 445 U.S. 931 (1980).

A person aids and abets in the commission of a crime when he or she: (1) undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime; and (2) consciously desires or intends that the conduct

---

[11] To convict Simplot of kidnapping, the state must prove beyond a reasonable doubt the following elements: (1) seizure or confinement of the victim; (2) lack of consent; (3) the use or threat of force; and (4) the intent to transport the victim out of state. Wis J I—Criminal 1281 (1990). Simplot was also charged with kidnapping while armed with a dangerous weapon and concealing identity. Sections 939.63 and 939.641, Stats.

will yield such assistance. *State v. Hecht*, 116 Wis. 2d 605, 620, 342 N.W.2d 721, 729 (1984).[12]

We are satisfied that the jury could reasonably conclude on the record that Simplot aided and abetted in the commission of the crimes of kidnapping and armed burglary.

As indicated above, on the day prior to the incident, Lisa, Michael Oliver and Simplot drove to Beloit in an unsuccessful effort to get the children and take them to Indiana. Michael Oliver testified that Simplot was upset at that time, stating they would "[g]et these damn kids back no matter what it takes," and that the three of them returned to Indiana and made plans to try again the following night.

Edwin Brooks testified that, in Simplot's presence, Mark Oliver asked him to help them get the children back. Brooks stated that masks were obtained from Simplot's room before they left Indiana and that Simplot was present when Mark Oliver obtained a gun to take with them. Brooks also stated that Simplot was not only in Bradley's house during the kidnapping but also took money from the kitchen.

One of the children saw Simplot with a gun as they entered the car outside Bradley's house. And, as we have noted, the Illinois officers found several weapons in the car, including a .25-caliber automatic pistol on the right rear passenger seat, where Simplot had been

---

[12] *Hecht* also sets forth the elements of conspiracy under the party-to-the-crime rule. First, there must be an agreement among two or more persons to direct their conduct toward the realization of a criminal objective; second, each member of the conspiracy must individually consciously intend the realization of the particular criminal objective. Each must have an individual "stake in the venture." *Hecht*, 116 Wis. 2d at 625, 342 N.W.2d at 732.

sitting when the car was stopped, a .22-caliber pistol from under the seat immediately to the front, and a shotgun in the rear hatch of the car.

Michael Oliver testified that, when the five of them first arrived in Beloit on Saturday, October 20, they went to Bradley's house and Simplot, along with Brooks and Mark Oliver, went up to the house and looked inside to make sure the children were there. They then left the scene briefly to search for a "getaway car." They also stopped briefly at Simplot's brother's house and Simplot remained in the house for a period of time. According to Michael Oliver, Lisa stated that the "visit" would provide Simplot with an alibi for the evening.[13] There was also evidence that before leaving Indiana, the group discussed making the incident look like an armed robbery.

We are satisfied that this evidence was adequate to convict Simplot as a party to the crime on both the kidnapping and burglary charges. *See State v. Alles*, 106 Wis. 2d 368, 377, 316 N.W.2d 378, 382 (1982) (if more than one inference can be drawn from the evidence, the inference supporting the jury finding must be followed unless the testimony was incredible as a matter of law).

## IV. JURY QUESTION

Simplot next argues that we should reverse his convictions because the trial court inadequately responded to a question from the jury during deliberations.

---

[13] Brooks also testified that, after their arrest, Simplot asked the other participants to "stick by" his alibi that he was not present during the kidnapping.

Several hours after beginning deliberations, the jury sent a message to the court asking: "If the defendant is found guilty of four points of kidnapping but coercion or privilege is found to be present, does coercion or privilege mean then that the verdict not guilty must be rendered?"

Conferring with counsel, the trial court initially indicated it would answer the question "yes." Believing, however, that the jury instruction was clear on the subject, the court eventually elected to respond to the jury's question by re- reading the instruction to them.[14] Simplot claims the court's response was inadequate because the jurors had heard the instruction several times before retiring to their deliberations, and thus their question must be seen as an indication that the applicable law was still unclear to them.

■

Just as the initial jury instructions are within the trial court's discretion, so, too, is the "necessity for, the extent of, and the form of re-instruction" in response to requests or questions from the jury. *Hareng v. Blanke*, 90 Wis. 2d 158, 166, 279 N.W.2d 437, 441 (1979). In *State v. Booth*, 147 Wis. 2d 208, 212-13, 432 N.W.2d 681, 683 (Ct. App. 1988), we concluded that, when the court receives an inquiry from the jury, it should

---

[14] The instruction stated in relevant part:

If you are satisfied beyond a reasonable doubt that the defendant seized [M.B.], [A.B.] and [K.S.] by force or threat of imminent force and did so without [their] consent and with intent to cause [them] to be transported out of this state and you are satisfied beyond a reasonable doubt that the defendant was not acting in a reasonable belief that the act was the only means of preventing or avoiding imminent death or great bodily harm to the defendant or to [the children], or that the acts of the defendant were not privileged, you should find the defendant guilty. If you are not so satisfied, you must find the defendant not guilty.

"respond . . . with sufficient specificity to clarify the jury's problem."

Simplot does not challenge the legal soundness of the instruction, and we agree with the state that it plainly told the jury that they must find Simplot not guilty if they concluded either (a) that he took the children in the reasonable belief that this was the only means of removing them from the threat of imminent death or great bodily harm, or (b) that he was acting reasonably to protect them in furtherance of the privilege that attaches to persons responsible for the welfare of children.

■

The trial court considered the jury's question and, after hearing argument from counsel, concluded that the instruction was clear on the point and elected to respond by re-reading it to them, indicating that if they still had a question after hearing it again (and having it available in writing in the jury room), they could bring it to the court's attention at that time. As we said in *Hareng*:

> No error in the instruction[ ] . . . has been pointed out. Nor is there any evidence to show that the . . . re-reading was misleading or confusing. We conclude that the court did not abuse its discretion in re-reading . . . a portion of the instruction[ ]. It was sufficient to satisfy the question posed by the jury. . . . The conduct of the trial court in this regard was appropriate. *Hareng*, 90 Wis. 2d at 167, 279 N.W.2d at 441.

## V. MISCELLANEOUS ASSERTIONS OF ERROR

Simplot sets forth several instances in which he claims the trial court's rulings denied him a fair trial. None are persuasive.

### *Permitting a Prosecution Witness to Confer With Counsel*

He suggests first that the trial court erred in calling a brief recess to allow Michael Oliver, a witness for the state, to confer with his attorney. He never objected at trial, however, and has thus waived any claim of error. *State v. Boshcka*, 178 Wis. 2d 628, 642, 496 N.W.2d 627, 632 (Ct. App. 1992).

Even so, the witness testified that he only told his attorney that he was nervous and did not discuss his testimony with him. That, coupled with the fact that the witness's testimony was essentially repeated by another witness, satisfies us that even if there was error it was harmless, for there is no reasonable possibility that it affected the result of the trial. *See State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231-32 (1985).

### *Violation of the Sequestration Order*

Simplot next argues that the trial court should have granted a mistrial when one of the children violated a witness sequestration order by conferring with Bradley during trial. But Simplot never moved for a mistrial: he simply asked the court to instruct Bradley not to talk to the witnesses, which the court did. If Simplot had misgivings about the alleged violation of

the sequestration order, he was obligated to move for a mistrial as soon as prejudice became apparent. *Walsh v. Wild Masonry Co.*, 72 Wis. 2d 447, 456a, 241 N.W.2d 416, 421 (1976). Because he obtained the only remedy he requested and has not explained how the alleged violation prejudiced his defense, we need not consider the argument further.

### *Disallowance of Demonstrative Evidence*

During the trial the prosecutor displayed before the jury two jackets found in Michael Oliver's car and had Lisa and Simplot stand up for size comparisons. Simplot argues that the trial court's denial of his request to try the jackets on — in order to demonstrate to the jury that neither was in his size — improperly denied him the right to present evidence in his defense and entitles him to a new trial. We disagree.

First, the trial court's ruling did not foreclose Simplot from trying the jackets on; it simply denied his initial request at the time, indicating that he could do so "if [he] wish[ed] later on." Simplot made no further request to try on the jackets and never raised the matter again until six days later, after completion of all the testimony, when he unsuccessfully moved for a mistrial.

Even so, the only incriminating factors relating to the jackets were that two bullets were found in one and that both were found in the rear compartment of the car in the area where a shotgun was also recovered — implying that the owners of the jackets would have known of the existence of the gun. We agree with the state that neither factor is significant in light of the considerable evidence — much of it discussed earlier in this opinion — indicating that Simplot was aware of

the guns and masks before coming to Beloit, and that he was seen carrying a gun following the incident at Bradley's house. Here, too, any error could not give rise to a reasonable possibility that the jury would have reached different verdicts had Simplot been able to try the jackets on. *Dyess,* 124 Wis. 2d at 543, 370 N.W.2d at 231-32.

### *Exclusion of Evidence of Bradley's Prior Violent Acts*

Simplot next argues that the trial court erroneously excluded evidence of Bradley's prior acts of violence, thus "unduly restricting" his ability to establish a defense that he was coerced into taking the children out of an imminently dangerous situation. Again, we disagree.

Questions concerning the admissibility of evidence are matters of the trial court's discretion. *State v. City of La Crosse,* 120 Wis. 2d 263, 268, 354 N.W.2d 738, 740 (Ct. App. 1984). Thus, "where the record shows that the court . . . considered the facts of the case and reasoned its way to a conclusion that is (a) one a reasonable judge could reach and (b) consistent with applicable law, we will affirm the decision even if it is not one with which we ourselves would agree." *Burkes v. Hales,* 165 Wis. 2d 585, 590, 478 N.W.2d 37, 39 (Ct. App. 1991) (footnote omitted).

We conclude that the trial court properly exercised its discretion in excluding the evidence. The court permitted both Simplot and Lisa to testify as to their personal knowledge of prior specific acts of violence committed by Bradley, noting that such evidence was admissible on their state of mind with respect to a belief that the children were in danger. The only evi-

dence excluded was testimony of other witnesses as to other acts of violence committed by Bradley, and there was no showing that Simplot was aware of those alleged incidents.[15]

Finally, the defense attempted to introduce testimony from Cindy Neblock, Bradley's former wife, that in 1983 or 1984, in Simplot's presence, Bradley struck her and knocked out her tooth. The trial court excluded the testimony, concluding that it was a collateral matter and that raising it would only confuse the jury. It was also remote in time from the incident at issue here, and, as the state points out, it was cumulative of other evidence of Bradley's prior violent acts. We see no erroneous exercise of discretion in the court's ruling on the issue.

### Use of Shackles

Simplot argues that he was denied due process of law when the trial court refused to order that his leg shackles be removed during the trial. He asserts that the shackles "interfered with counsel for both defendants being able to sit next to each other and discuss the case," and he believes that on at least one occasion "the jurors could see the[m]."

Whether to keep a defendant restrained during trial is discretionary with the court. *Sparkman v. State*, 27 Wis. 2d 92, 96, 133 N.W.2d 776, 779 (1965). The court must, however, set forth in the record its

---

[15] The evidence dealt with alleged abusive sexual encounters between Bradley and a young child and Bradley and a teenager at some time in the past. As indicated, however, Simplot made no showing that he was aware of either incident.

reasons for the restraints. *Flowers v. State*, 43 Wis. 2d 352, 363, 168 N.W.2d 843, 849 (1969).

Although as a general rule defendants should not be restrained during trial, "the rule is not absolute as the safety of the court, counsel, witnesses, jurors, and the public may demand [restraining the] accused even in the presence of a jury." *State v. Staples*, 99 Wis. 2d 364, 373, 299 N.W.2d 270, 275 (Ct. App. 1980).

On the first day of trial, Simplot expressed his concern about being visibly shackled in the presence of the jury. The trial court noted that the tables at which Simplot and Lisa sat were covered and situated so that the shackles would not be visible to the jury unless the defendants made an effort to display them.

At the end of the first day of trial, Simplot and Lisa repeated their concerns and the court replied that, because they had both been charged with substantial, serious crimes which involved the use of weapons, it agreed with the sheriff's recommendation that shackles were necessary to maintain security in the courtroom.

Finally, although Simplot asserts that one or more jurors may have seen the restraints, he never substantiated the claim by naming those jurors. We conclude that the court's explanation of its reasons for restraining Simplot and his codefendant during the trial were adequate and that it did not exceed the bounds of its discretion in ruling as it did. That being so, we may not overturn the ruling, even if it is one with which we disagree. *Burkes*, 165 Wis. 2d at 590, 478 N.W.2d at 39.

## VI. NEWLY DISCOVERED EVIDENCE

Simplot claims that a letter written by Bradley to Mark Oliver several months after the trial constitutes newly discovered evidence entitling him to a new trial. The letter stated that Bradley felt no ill will toward Oliver over the incident and noted that "the kids don't even remember [the kidnapping] so that[']s history." Simplot argues that, if the children were unable to remember the incident four months later, they must have been incompetent to testify at trial as to his involvement in the crime.

To warrant a new trial, newly discovered evidence must meet the following criteria:

> (1) The evidence must have come to the moving party's knowledge after a trial; (2) the moving party must not have been negligent in seeking to discover it; (3) the evidence must be material to the issue; (4) the testimony must not be merely cumulative to the testimony which was introduced at trial; and (5) it must be reasonably probable that a different result would be reached on a new trial. *State v. Bembenek*, 140 Wis. 2d 248, 252, 409 N.W.2d 432, 434 (Ct. App. 1987).

The proffered evidence fails the third and fifth elements of the test. It is not material to the issue, because it neither identifies which of the three children no longer remembers the incident nor what it is about the incident that had been forgotten. And, even if the children could no longer recall the incident at the time Bradley wrote the letter, there is no indication that they did not remember it when they testified. Indeed, as the state correctly notes, it takes a considerable

"leap of logic" to conclude from Bradley's letter that the children were incompetent to testify at trial due to faulty memory.

We are also satisfied that, even if the letter had been introduced, there is no reasonable possibility that Simplot would have been acquitted. Two of the three children testified at trial and, taken together, their testimony constituted only a small part of the evidence which led to Simplot's conviction. As indicated earlier in this opinion, substantial evidence was presented at trial on Simplot's guilt on both charges.

*By the Court.*—Judgment and order affirmed.

GARTZKE, P.J. (*dissenting in part, concurring in part*). Before holding that defendant may be found guilty of kidnapping under sec. 940.31(1), Stats., we should direct the parties to brief the question whether the legislature intends that statute to apply to defendant in view of the child abduction statute, sec. 948.30(2), Stats., which provides in relevant part:

> Any person who, *for any unlawful purpose*, does any of the following is guilty of a Class B felony:
> (a) By force or threat of imminent force, takes a child who is not his or her own by birth or adoption from the child's home or the custody of his or her parent, guardian or legal custodian. (Emphasis added.)

Here defendant acted to regain the children for his sister, the lawful custodian,[1] while she waited in the car. The children were reunited with her upon reaching the car.

---

[1] The mother has sole legal custody of the three children.

If defendant took his sister's children at her request to deliver them to her, and if she had the right to the children, defendant could not be prosecuted under sec. 948.30(2), Stats., because he lacked "an unlawful purpose." Nothing in sec. 948.30(2) suggests that how a child is taken deprives the purpose of lawfulness. Indeed, it contemplates that the abductor may take a child through "force or threat of imminent force" without violating the statute, so long as the abductor's purpose is not unlawful. He could, of course, be charged with other crimes, such as armed burglary (while concealing identity), committed in the course of that taking, whether or not he could be charged with abduction under sec. 948.30(2).

If defendant could not be charged with abduction under sec. 948.30(2), Stats., the question arises why he could be charged with kidnapping under sec. 940.31, Stats. It would seem odd that a defendant could not be charged with abduction, and yet could be charged under the general kidnapping statute.

Because the question has not been briefed, we should require further briefing. I therefore dissent from the majority's view that defendant can be found guilty under the kidnapping statute, not because I think that the majority is wrong but because the issue requires investigation. I join the majority opinion with respect to its resolution of the other issues.